# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| STEVEN OLIVER ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| MARLIN GUSMAN, CHAZ RUIZ, ) | Docket No.18-cv-7845(J)(4) |
| EDWIN HOSLI, MICHAEL LAUGHLIN, ) | Judge Carl J. Barbier |
| MICHAEL LEE, THOMAS ) | Magistrate Karen Wells Roby |
| SUTHERLAND, JAMIE MASSEY, ) | |
| and XYZ INSURANCE ) | |
| COMPANIES 1-5, ) | |
| ) | |
| Defendants. ) | |

## SECOND AMENDED COMPLAINT

COMES NOW, the plaintiff, Steven Oliver, by and through undersigned counsel, who files this Amended Complaint against the above defendants and, in support, states the following:

## I.    INTRODUCTION

Amidst a legacy of inmate-on-inmate violence and under-reporting incidents of such violence, Steven Oliver and Corey Simmons were attacked by another prisoner, Jamie Massey, en route from OJC to Hunt Correctional Facility.  During the attack, two Sheriff employees, Michael Lee and Thomas Sutherland, were riding in the front of the transporting vehicle. Despite witnessing the attack, Defendants Lee and Sutherland, chose not to intervene to stop the attack and prevent or mitigate the injuries to Oliver and Simmons. After the incident, rather than report the attack to their superiors, Defendants Lee and Sutherland chose to remain silent in an attempt to hide their inaction.  The actions complained of here are the predictable result of a long series of dereliction in the prevention of violence at OJC and the under reporting of such violence. This

1

lawsuit ensues.

## II.    JURISDICTION AND VENUE

1.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a).

2.    Venue is proper in the Eastern District of Louisiana, under 28 U.S.C. § 1391(b)(2), since the claim arose in this district and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## III.   PARTY PLAINTIFF

3.    Steven Oliver is a resident of New Orleans, Louisiana, is of full age of majority and possess the capacity to file suit.

## IV.   PARTY DEFENDANT

4.    DEFENDANT MARLIN GUSMAN is the Sheriff of Orleans Parish, Louisiana.  He has responsibility for the policies, procedures, and operations of the Orleans Parish Sheriff's Office, its employees, agents, and assigns, including all correctional facilities comprising Orleans Justice Center ("OJC"), including transport vans.  He is a policymaker for the Orleans Parish Sheriff's Office and the OJC.  Gusman had a policy of failing to adequately staff the OJC and a policy of failing to adequately train the staff at the OJC. Defendant and his policies exhibited deliberate indifference to Plaintiff's Eighth Amendment Right against cruel and unusual punishment and to his Fourteenth Amendment Right to due process. The defendants, Gusman was subjectively aware of the ongoing inmate on inmate violence and the excessive risk to inmate safety it entailed, yet he disregarded this substantial risk of serious harm and continued to permit these problems to occur. The injuries to Oliver occurred as a result of this deliberate indifference.  He is sued in his individual capacity for nominal, compensatory and punitive damages. He is also sued in his official capacity.  He is a resident of full age and majority of the Eastern District of Louisiana.

5.      DEFENDANT CHAZ RUIZ was the Warden of the Orleans Justice Center at the time of this incident.  He had responsibility for the policies, procedures, and operations of the OJC, its employees, agents, and assigns, including all correctional facilities comprising OJC, including transport vans. He is a policymaker in terms of ensuring that staff properly intervene to protect prisoners when they are attacked by other prisoners.  Similarly, he is a policymaker responsible for ensuring that staff properly follow the proper practice of promptly reporting inmate-on-inmate violence and staff misconduct. Defendant Ruiz had a policy of allowing dereliction in his staff's investigation of inmate-on-inmate violence and reporting of staff misconduct.  Defendant Ruiz has a policy of allowing inmate-on-inmate violence to occur rampantly in the OJC and a policy of taking no measures and/or ineffectual measures to ameliorate the violence. His policies exhibited deliberate indifference to Plaintiff's Eighth Amendment Right against cruel and unusual punishment and to his Fourteenth Amendment Right to due process. Ruiz was subjectively aware of the ongoing inmate on inmate violence and the excessive risk to inmate safety it entailed, as well as the well documented problems with investigations in the OJC, yet he disregarded this substantial risk of serious harm and continued to permit things to remain as they always were. The injuries to Oliver occurred as a result of this deliberate indifference. He is sued in his individual capacity for nominal, compensatory and punitive damages.

6.      Defendant EDWIN HOSLI was and is the Director of the Investigative Services Bureau ("ISB") at the Orleans Parish Sheriff's Office.  He has responsibility for the policies, procedures, and operations of the ISB its employees, agents, and assigns for investigating and reporting inmate-on-inmate violence and staff misconduct.  He is a policymaker for investigations at the Orleans Justice Center. Hosli had a policy of failing to train the staff adequately at the OJC in the proper way to do investigations into staff misconduct and inmate-on-inmate violence and a policy of allowing derelict investigations. His policies exhibited deliberate indifference to

Plaintiff's Eighth Amendment Right against cruel and unusual punishment and to his Fourteenth Amendment Right to due process. The Defendant Hosli was subjectively aware of the inadequate investigations into staff misconduct and inmate-on-inmate violence and the excessive risk to inmate safety it entailed, yet he disregarded this substantial risk of serious harm and continued to permit inadequate training and investigations. The injuries to Oliver occurred as a result of this deliberate indifference.  He is sued in his individual capacity for nominal, compensatory and punitive damages.

7.     DEFENDANT MICHAEL LAUGHLIN was and is the Chief of Investigations for the Orleans Parish Sheriff's Office.  He has responsibility for the policies, procedures, and operations of the ISB its employees, agents, and assigns for investigating and reporting inmate-on-inmate violence and staff misconduct.  He is a policymaker for investigations at the Orleans Justice Center. Laughlin had a policy of failing to train the staff adequately at the OJC in the proper way to do investigations into staff misconduct and inmate-on-inmate violence and a policy of allowing derelict investigations. His policies exhibited deliberate indifference to Plaintiff's Eighth Amendment Right against cruel and unusual punishment and to his Fourteenth Amendment Right to due process. The Defendant Laughlin was subjectively aware of the inadequate investigations into staff misconduct and inmate-on-inmate violence and the excessive risk to inmate safety it entailed, yet he disregarded this substantial risk of serious harm and continued to permit inadequate training and investigations. The injuries to Oliver occurred as a result of this deliberate indifference.  He is sued in his individual capacity for nominal, compensatory and punitive damages.

8.     DEFENDANT MICHAEL LEE was an employee of the Orleans Parish Sheriff's Office, under the direction and supervision of Defendant Gusman. Defendant Lee failed to intervene to protect Mr. Oliver from inmate-on-inmate violence.  Furthermore, Lee failed to report the

4

violence as he should have and did not report Defendant Sutherland (or self-report) for failing to intervene to protect Mr. Oliver.  Both actions were consistent with existing policy in August 2017.  He is sued in his individual capacity for nominal, compensatory and punitive damages.

9.      DEFENDANT THOMAS SUTHERLAND was an employee of the Orleans Parish Sheriff's Office, under the direction and supervision of defendant Gusman. Defendant Sutherland failed to intervene to protect Mr. Oliver from inmate-on-inmate violence. Furthermore, Sutherland failed to report the violence as he should have and did not report Defendant Lee (or self-report) for failing to intervene to protect Mr. Oliver.  Both actions were consistent with existing policy in August 2017.  He is sued in his individual capacity for nominal, compensatory and punitive damages.

10.     JAMIE MASSEY is person of full age and capacity and capable of being sued.  Mr. Massey committed an aggravated battery of Oliver that caused significant injuries to Plaintiff. He is sued in his individual capacity only and is a resident of New Orleans, Louisiana.  He is presently incarcerated in the Plaquemines Parish Detention Center in Davant, Louisiana.

## V.  STATEMENT OF FACTS

   *1.   The Attack on Steven Oliver.*

11.    On August 17, 2017, Lee and Sutherland were driving a van transporting inmates to the Elayn Hunt Correctional Facility when prisoner Jamie Massey somehow began to remove his belly chain restraint.  Massey hit inmate Corey Simmons with the padlock on the chain and choked him with the restraint, causing multiple facial injuries and (spraying) blood throughout the van. Massey then struck Mr. Oliver several times and used his thumb to poke him in the rectum through his pants.

12.    This incident occurred in an official vehicle that was transporting Orleans Parish inmates to Elayn Hunt Correctional Center ("Hunt").  (Prisoners in the custody of Sheriff Gusman who

required mental health care are routinely held at Hunt. Lee and Sutherland failed to stop the vehicle or help the injured prisoners. They also didn't call their commanders to report the attack or ask for help from any other agencies along the way.

13.     Other passengers in the van were witnesses to the assault.  According to investigators said video and audio evidence from the transport van showed the beating and recorded its duration.

14.     The assault lasted for 22 minutes, during which time Massey was able to beat and choke inmates Simmons and Oliver.

15.     At 12:10pm Jamie Massey, removed his belly chain restraint and began to attack Corey Simmons.

16.     At 12:56 p.m. Massey struck Simmons in the face with a padlock and choked him with the chain. Massey then attacked Mr. Oliver, by striking him several times and assaulting him by putting his thumb in Oliver's rectum through his pants.

17.     According to arrest documents the altercation stopped at 1:18 p.m., three minutes before the van arrived at the Elayn Hunt Correctional Facility.

18.     During the entire incident, Mr. Oliver was restrained and unable to move or defend himself while his hands and feet were in cuffs.

19.     Following the incident, Mr. Oliver and Mr. Simmons required medical attention for facial lacerations, fractured nasal bones, contusions of the scalp, and back injuries.

20.     The acts and failures of Defendants were intentional, wanton, malicious, reckless, and callously indifferent to the rights of Mr. Oliver.

21.     By August 17, 2017, the number of instances of inmate on inmate violence at OJC was legion, as documented by each and every report of the Orleans Parish Jail Monitors ("Jail Monitors" or "Monitors").  Defendants Gusman, Ruiz, Hosli, and Laughlin's historic failure to decrease and stop inmate on inmate violence is legion.  Similarly, the history of under reporting

and derelict reporting of inmate-on-inmate violence and staff misconduct by OJC staff is well documented.

22.     Defendants Gusman, Ruiz, Hosli, and Laughlin have and had a de facto policy and practice of not holding staff members accountable for inmate safety. Defendants Gusman, Ruiz, Hosli, and Laughlin have and had a de facto policy and practice of failing to report or investigate inmate-on-inmate violence.  Defendants Gusman, Ruiz, Hosli, and Laughlin have and had a de facto policy and practice of allowing inmate-in-inmate violence for inmates in their custody.

23.     Defendants Gusman, Ruiz, Hosli, and Laughlin knew or should have known that their actions violate the federal constitution.  Federal law enforcement, including the United States Department of Justice, has notified Defendants that their actions violate federal law in numerous areas involving the investigating and decreasing inmate-on-inmate violence.

   *2.   The Department of Justice's Investigation into Inmate-on-Inmate Violence and Security's Inability to Document and Report such violence.*

24.   The United States Department of Justice began an investigation of the OJC in 2008.  Part of its investigation was dedicated to inmate-on-inmate violence and the Sheriff's Office procedures for reporting such violence and investigating misconduct among its officers.  *See* USDOJ Letter of Findings, Sept. 11, 2009, at 9-11, 12-13 ("Findings Letter").

25.   Its preliminary findings led it to the conclusion that "[t]he *frequency and serious nature of injuries sustained by OPP inmates represents a systemic level of violence that poses a serious risk of harm to both inmates and correctional staff* at the jail[]", and "that *inmates confined at OPP are not adequately protected from harm, including physical harm from …inmate-on-inmate violence.*" (emphasis added) Bear in mind this observation was made in 2009.

26.   In April 2012, prisoners housed in what is now called "the Orleans Justice Center" filed a lawsuit entitled *Jones v. Gusman*. The United States Department of Justice ("Department" or "USDOJ") subsequently intervened in that lawsuit on the side of the prisoner plaintiffs.

7

27.   At the same time, in April 2012, the Department wrote Sheriff Gusman to say pointedly, "[d]espite our findings and repeated attempts to encourage you to meaningfully address the numerous problems, the already troubling conditions at the OJC are deteriorating."

28.   Since the findings letter in September 2009, according to the Department, the Sheriff had "failed to take basic steps to correct the systemic issues that [were] identified." Finding Letters Update, at 1.  "Urgent and substantial actions is required[,]" causing the Department to urge the Sheriff to "take immediate steps to address the concerns raised in this letter regarding the most basic measures to ensure prisoners safety, health, and well-being…"

29.   In the same letter, the Department informed Defendants that "[i]t is largely incontestable that the deficiencies in the operation of OPP violate the Constitution."  When the USDOJ Civil Rights Division inspected the jail on April 3 through 5, 2012 it "found alarming conditions and were distressed the problems [] described in [the] initial findings letter persist or have worsened." Furthermore, it found that "OPP is a violent and dangerous institution[]" after  "[its] inspection uncovered shockingly high rates of serious prisoner-on-prisoner violence and officer misconduct."

30.   Their letter concluded that "[t]he conditions in OPP fail to meet the most basic obligation of prison officials to provide humane conditions of confinement." The "conduct of officials at OPP evinces deliberate indifference to basic needs, including safety…" and "the conditions clearly meet both the subjective and objective components of the deliberate indifference test."

31.    On June 6, 2013, the USDOJ, and the Sheriff executed a consent judgment the purpose of which was "to address the constitutional violations alleged in this matter, as well as the violations alleged in the findings letter issued by the United States on September 11, 2009." *Jones v. Gusman*, EDLA Docket No. 12-859-LMA-ALC, *Order Approving Consent Judgment and Certifying Settlement Class*, R.Doc. No. 465, at 5 (June 6, 2013) (hereinafter "OPP Consent

Decree Order").

>    *3.    The Sheriff's Recent History of Not Protecting Inmates from Other Inmates.*

32.    On February 13, 2014, the Monitors issued their first report. Its introduction was portentious:  "Said succinctly, the inmates held in facilities operated by the OPSO continue to be at risk of serious harm. The facilities have insufficient health professional and security staffing; insufficient policies; inadequate training and supervision; confusing and disorganized medical record keeping practices." Furthermore, it observed that "the lack of adequate facilities, staff, policies, and training results in an OJC system that fails to provide prisoners with a safe and secure environment. There is a great likelihood that prisoners are subjected to unnecessary or excessive force by OPSO staff and/or violence by other prisoners."

33.    In October 2014, the Monitors stated bluntly that "[t]he level of harm in the Orleans Parish Jail system continues to be extremely high…evident by the number of assaults on inmates."

34.    The February 2015 report began by saying, "The safety of staff and inmates remains a critical issue….[f]rom August 1, 2014 through the date of this report, more than 226 critical incidents have been reported to the Monitors [including] uses of force, inmate assaults on inmates…" Later in the report, it noted that "[t]he level of harm and risk in the Orleans Parish Jail System continues to be extremely high despite the Consent Judgment having been in place for [sic] since October 21, 2013. Third Report, 29-30. Like the last report, the Monitor measured the dangers by the number of assaults on inmates by other inmates coupled with the fact that staff is often unaware that assaults are taking place due to lack of supervision.

35.    Things had not improved over the last two years:  the Monitor noted that "[t]he level of harm and risk in the Orleans Parish Jail System continues to be extremely high despite the Consent Judgment having been in place for [sic] since October 21, 2013." Like the last two reports, the Monitor measured the dangers by the number of assaults on inmates by other inmates

coupled with the fact that staff is often unaware that assaults are taking place due to lack of supervision.

36.    By September 2015 report, "[t]he monitors [were] so concerned about the continuing inmate/inmate violence and the conditions in the current jail facilities…that [they] advised the Court during the Status Conference of August 6, 2015, that, if the new jail does not begin to accept inmates by September 15, 2015, inmates must be housed in jails outside Orleans Parish."

37.    Between September 2015 and March 2016, the Defendants moved the inmate population to another building. At the time, "[t]he Monitors note[d] that there has been no progress toward compliance, and in fact, there has been regression. While the opening of the Orleans Justice Center should have heralded a new era for the Parish in terms of progressive jail management and inmate safety; the reality is that this has not happened."

38.    In March of 2016, the Monitors noted the inmate-on-inmate violence is tied to the prevalence of unreported violence in the jail.

39.    There was little progress on inmate violence between March and August 2016. Specifically, according to the Monitor's Report, "What progress has been made in the past six months is overshadowed by the increase in danger to the inmates in OJC. This increased danger, documented by the seriousness of inmate/inmate altercations, uses of force, assaults on staff, and damage to the building, are exacerbated by unacceptable levels of staffing, inadequate employee training and supervision, and leadership that is overwhelmed."

40.    As of August 2016, the Monitor noted at the time that "[t]he level of harm and risk of harm in the Orleans Parish Jail system continues to be extremely high despite the Consent Judgment having been in place since October 21, 2013. This danger is evident by the number of assaults on inmates by other inmates including sexual assaults as reported to the Monitors by OPSO and the evidence of numerous unreported incidents of inmate on inmate violence discovered by the

Monitors through review of records, reports from plaintiffs' counsel, and grievances."

41.    The Monitors inspected the jail the next year, in April 2017, and found that "[i]nmates in the custody of the Orleans Parish Sheriff's Office housed in OJC are marginally safer than when [the August 2016] Report #6 was produced. The level of violence remains at unacceptable levels." Specifically, "[t]he level of harm and risk of harm to inmates held in the Orleans Parish Jail system continues to be extremely high …evident by the number of assaults on inmates by other inmates including sexual assaults as reported to the Monitors by OPSO and the evidence of numerous unreported incidents of inmate on inmate violence…"

42.    In January 2018, the Monitor reported no change in the violence between inmates:  "The level of violence within the facilities remains high - including inmate on inmate assaults.***There are still serious incidents for which no report is prepared by OPSO staff; including inmate on inmate assaults resulting in hospitalization." It found that "[a]n essential element to ensure inmate safety is OPSO's timely review of serious incidents to assess cause(s) and then to develop and implement actions [sic] plans to address the issue(s). This is not done."

43.    As is evidence, the inmate on inmate violence is pervasive in the OJC. Defendant Gusman, Ruiz, Hosli, and Laughlin's inability to remedy or decrease the violence is a de facto policy. This policy was the direct cause of harm to the Plaintiff.

   *4.    The Sheriff's History of Derelict Reporting of Inmate-on-Inmate Violence.*

44.    Like inmate-on-inmate violence, the Defendants have a de facto policy of under reporting such incidents, including not reporting over half of such incidents that occur to prisoners in their custody.

45.    As of 2008 and 2009, the Sheriff's Office routinely did not report use of force incidents and in fact "officers routinely fail[ed] to adequately document incidents." To compound this problem, OPP did not have a policy for administrative review of use of force reports.

46.    In 2009, the Department recommended several remedial measures "…in order to address the identified deficiencies and protect the constitutional rights of inmates confined at OPP, the Jail should implement, at a minimum***Ensure that staff adequately and promptly report incidents."

47.    Three years later, when the Department inspected the jail in 2012, not much had changed. Based on their inspection of the jail in April 2012, it concluded that "[the] climate of fear and violence is caused by systemic deficiencies" including that "[s]taff at OPP exacerbate dangerous situations and *ignore prisoner pleas for help*." It went on:  "Prisoners we interviewed consistently allege that they were seriously injured or witnessed other prisoners get seriously injured *after staff ignored fights or requests for help* or even exacerbated the problem by placing prisoners in dangerous situations."

48.    Regarding investigations, nothing had improved in that department in the intervening three years.  As of April 2012, "OPP fail[s] to adequately identify and investigate misconduct[,]" including "inappropriately clos[ing] cases in which the victim prisoner refuses to cooperate, regardless of the level of injury." Moreover, in a problem that persists, OPP did not have a system sufficient to track incidents involving the same officer. It concluded that "OPP needs to do more to ensure that all acts of violence are fully investigated and the perpetrators are not in a position to re-offend."

49.    The June 2013 consent decree in Jones v. Gusman lamented the problems associated with derelict investigations by Defendants.  The consent decree noted that "OPP's investigative process for staff and prisoner misconduct fails to address, and is itself part of, the many operational breakdowns in OPP's accountability systems."

50.     It went on to say that Defendants' policies and practices related to investigating use of force at OPP does not live up to the minimum standards required by the constitution:  "Training

12

records suggest that SOD members do not receive any in depth or specialized training relative to investigations.  The training that OPSO staff members generally receive includes materials focused on police investigations and car stops, but there is no indication of regular or in-service training relative to the conduct of investigations in a jail or prison environment. OPP does not effectively track use of force or reports of staff misconduct." The same problems persist in this case.

51.     This problem had not changed as of February of 2013.  At that time the Monitor's found that Defendants' policies and procedures regarding its reporting system is not "comprehensive and [does not] accord[] with generally accepted correctional standards…In particular, there is no mechanism to ensure that all uses of force are properly reported and investigated in accordance with the policy." This problem persists.  It further found that "[t]he level of harm and risk of harm in the [OJC] system is extremely high. This is evident by the number of assaults on prisoners by other prisoners including sexual assaults. Even more disturbing is that staff is often unaware that an assault is taking place due to the lack of supervision in the housing units."

52.     The Monitors report from August 2014 stated plainly, with regard to use of force and protection of inmates from violence by other inmates, that "[s]ince December, 2013, little has changed in these areas."

53.     The Monitors report from August 2014 indicated that despite Defendants having a use of force policy that includes "a reporting system, it is clear, after seven on-site tours that the current policy is not followed or enforced on a consistent basis." "The review of reports during the court tours since December, 2013 revealed that the same problems that were noted in the February, 2014 report still exist."

54.     On the same note, as of August 2014, "there [wa]s no automatic tracking system to ensure timely notification is made. While completed reports are to be assigned a number, there is

no follow up to make sure the reports are written can/or are reviewed within 36 hours and forwarded to the Internal Affairs Division." Furthermore, in a passage that harkens to the instant case, "[there is] no system to alert the Warden or Assistant Warden if the shift/watch commander does not complete the initial review in a timely manner…no system for tracking whether the reviews are being send to IAD and the results of the review by IAD."

55.     By February of 2015, the same problem remained.  The Defendants had not implemented a mechanism to ensure that all uses of force were reported and that supervisors were reviewing those reports and the Defendants still had no mechanism to make sure reports are even written to documents inmate-on-inmate violence.   At the same time, the Monitors estimated that less than one third of reports are timely reviewed and the problem of tracking the reports remained.

56.     In March of 2016, the Monitors noted the prevalence of unreported violence in the jail. "Since the beginning of monitoring, we were aware that there was a level of inmate-on-inmate violence and staff uses of forced that were not reported." It observed that "[t]he scope of the under or unreported incidents is highly significant and extremely troubling."

57.     To compound the problem, it observed in 2016, that, "in the majority of the incidents, staff did not write an incident report or a use of force report at all." This lead the Monitors to believe that at least 50% of the serious incidents were not being reported. The Monitors believed that one of the causes of this unacceptable inmate on inmate violence is that the "[l]ack of reporting compromised the ability to initiate criminal and/or administrative investigations"

58.     By 2016, after all the efforts at reform, the Defendants still oversaw a "system that fails to provide inmates with a safe and secure environment. Particularly, there is a great likelihood that inmates were being subjected to violence by other inmates." Still defendants had "nothing in place to ensure all reportable incidents are being documented and that the incidents are being recorded adequately and accurately.".

59.     Six months later, "the Monitors continue[d] to believe that there are unreported violence including inmate/inmate assaults, in the facility." Similarly, investigations continued to take too long, which was partly explained by the fact that those responsible for conducting investigations are required to fill other job duties.

60.     The Monitors inspected the jail a year later, in April 2017, and found that same problem that existed years earlier: "[T]here is nothing in place to ensure all reportable incidents are being documented and that the incidents are being recorded adequately and accurately. The Monitors' concern in past compliance reports about there being nothing in place to ensure all reportable incidents and uses of force were being reported and that incidents and uses of force were being reported adequately and accurately has proven to be warranted." Finally, at the same time, the Monitors also expressed their concern that staff was not being disciplined for not reporting incidents.

## VI.     CAUSES OF ACTION

### A.  THE EIGHTH AND FOURTEENTH AMENDMENTS.

61.     Plaintiff re-alleges and incorporates each and every foregoing paragraph.

62.     Defendants were deliberately indifferent to plaintiff's safety.

63.     Defendants acts and omissions in furtherance of the de facto policies and practices resulting in the physical abuse inflicted on Plaintiff constitute cruel and unusual and unwarranted punishment.

64.     Defendants Gusman, Ruiz, Hosli, ad Laughlin's acts and omissions in furtherance of their policies and practice caused Defendant Lee and Sutherland not to be reprimanded or disciplined for beating plaintiff.

65.     Defendants Gusman, Ruiz, Hosli, ad Laughlin's de facto policies of not reporting inmate-on-inmate violence caused Lee and Sutherland not to report this incident to their superiors.

66.     Defendants Lee and Sutherland failed to intervene to stop or mitigate the beating Oliver and Simmons received from Massey.

67.     Defendants Massey was able to persist in his attack of Oliver and Simmons due to Lee and Sutherland's inaction.

68.     Defendants' acts and omissions in further of their policies and practice of refusing to treat Plaintiff's medical needs constitutes deliberate indifference to his serious medical needs.

         **B.  STATE LAW CAUSES OF ACTION.**

69.     Plaintiff re-alleges and incorporates each and every foregoing paragraph.

70.     Defendants Massey, Sutherland and Lee are liability for battery upon Oliver and Simmons.

71.     Defendants Gusman is liable to Plaintiff due to Sutherland and Lee committing torts in the course and scope of their employment with the Sheriff's Office.

72.     Defendants Gusman, Ruiz, Hosli, and Laughlin are liable for his negligence in supervising Sutherland and Lee.

73.     Defendants Sutherland and Lee are liable for their negligence in protecting Oliver and Simmons.

74.     Plaintiff continues to suffer pain due to the acts and omissions of defendants.

         **C.  STATE LAW DIRECT ACTION.**
          (All Defendant Insurance Companies)

75.     Plaintiff repeats and realleges each allegation of the complaint.

76.     Defendant Insurance Companies, on information and belief, have issued and/or currently have in effect one or more policies of insurance covering one or more of the Defendants named herein. For valuable consideration received, these policies obligated Defendant Insurance Companies, jointly and/or severally, to pay on behalf of their insured Defendant(s) any sums the insured Defendant(s) may become obligated to pay to Plaintiff or to indemnify their insured

16

Defendant(s) for any sums the insured Defendant(s) may become obligated to pay to Plaintiff.

77.     By reason of their illegal and unconstitutional acts, Defendants are liable to Plaintiff for all damages and injuries Plaintiff has suffered as a result. Upon information and belief, Defendant Insurance Companies are contractually obligated to pay these sums on behalf of the insured Defendant(s).

78.     On information and belief, Defendant Insurance Companies are liable to Plaintiff for any and all damages incurred by reason of the insured Defendant(s)' acts, up to their policy limits, notwithstanding the fact that the insured Defendant(s) may themselves be able to assert claims of privilege or immunity from liability.

79.     Under Louisiana Revised Statute § 22:655(B), Plaintiff brings a direct action against Defendant Insurance Companies to recover any and all sums they are obligated to pay Plaintiff on behalf of their insureds or to indemnify their insureds.

## VII.    PRAYER FOR RELIEF

THEREFORE, plaintiff respectfully requests that this Court enter the following relief:

1.  Render judgment for Plaintiff;

2.  Award special damages;

3.  Award compensatory damages;

4.  Award Plaintiff its costs and reasonable attorneys' fees incurred in this action, pursuant to 42 U.S.C. § 1988;

5.  Award punitive damages against defendants.

6.  Order such other and further relief, at law or in equity, to which Plaintiff may be justly entitled.

Date:   February 4, 2019

Respectfully submitted,


_/s/ John Adcock_____
JOHN ADCOCK
Louisiana Bar No. 30372
3110 Canal Street
New Orleans, LA 70119
T: (504) 233-3125
F: (504) 308-1266
Email:  jnadcock@gmail.com


**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 4th day of February, 2019, a copy of the First Amended Complaint was filed electronically with the Clerk of Court using the CM/ECF system, and that service will be provided through the CM/ECF system, as well as by U.S. Mail, Electronic Mail or hand delivery for any non-CM/ECF participant.


_/s/ John Adcock_____